IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRACEY NADIRAH SHAW | : | |
| | : | |
| *Plaintiff,* | : | Civil No. 1:17-cv-00229-SPB |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS; DR. REBECCA BURDETTE; and DR. LAWRENCE ALPERT, Medical Director at SCI Cambridge Springs | : | ELECTRONICALLY FILED |
| | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| *Defendants.* | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT DOC'S MOTION TO DISMISS**

**I.      INTRODUCTION**

Plaintiff Tracey Shaw brings this action pursuant to 42 U.S.C. § 1983 for violations of her rights under the Eighth Amendment of the United States Constitution, the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12132; and the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Ms. Shaw suffers from progressively worsening chronic neuropathic pain in her back, neck, legs, and pelvic area caused by serious medical conditions including spinal stenosis, osteoarthritis of the spine, degenerative joint disease in her hips, and fibromyalgia. As a result of the Pennsylvania Department of Corrections' refusal to consistently grant Ms. Shaw accommodations including access to a wheelchair, she has been denied access to numerous programs and services at the State Correctional Institution at Cambridge Springs.

1

## II. FACTUAL SUMMARY

Ms. Shaw's neuropathic pain and fibromyalgia substantially limit her mobility, her ability to walk from place to place, and her ability to stand for lengthy periods of time. First Amended Complaint [hereinafter "FAC"] at ¶ 68. On or about December 23, 2016, Ms. Shaw was stripped of her job as a block worker expressly because of her disability. *Id*. at ¶¶ 69-72. This was done even though her physical impairments had not prevented her from working up to that point, and without any medical examination. *Id*. at ¶¶ 72, 74, 76. Defendants failed to provide any replacement job for nearly six months. *Id*. at ¶¶ 75, 78.

Due to her disability, Ms. Shaw has been allowed the use of a cane to assist in walking for more than 10 years. *Id*. at ¶ 81. As her condition worsened due to the termination of her Lyrica prescription, Ms. Shaw suffered increased pain and difficulty walking, including weakness and a greater risk of falling when attempting to walk longer distances as required to access the dining hall and med line. *Id*. at ¶ 82. In October 2016, Ms. Shaw was granted the use of a wheelchair to assist in traveling longer distances. *Id*. at ¶ 86. Ms. Shaw sent a request to Defendant Alpert on November 27, 2016 and filed a disability accommodation request form in December 2016 seeking renewal of her permission to use the wheelchair due to the chronic pain and her difficulty walking. *Id*. at ¶¶ 87-88. The request was initially granted on December 6, 2016, effective for sixty days, but was then rescinded only ten days later, the day after Corrections Health Care Administrator Anderson reproached Ms. Shaw for filing grievances and accommodation requests. *Id*. at ¶¶ 88-92. Without her wheelchair, Ms. Shaw almost fell the following day while walking over ice on the way to medication line. *Id*. at ¶ 95.

In January 2017, Ms. Shaw informed prison officials at SCI Cambridge Springs that she had collapsed on the floor in her room due to "the chronic pain radiating in my legs after having a half day of walking due to my daily activities." *Id*. at ¶ 97. Without use of the wheelchair, Ms. Shaw missed two out of three meals most days, and all three meals on numerous other days. *Id*. at ¶¶ 98-100. Since the wheelchair was taken away in December 2016, Ms. Shaw has lost more than 20 pounds due to her inability to attend meals. *Id*. at ¶ 101.

On January 14, 2017, Ms. Shaw fell, requiring medical attention and an overnight stay in the medical department, due to her walking a long distance without the assistance of a wheelchair. *Id*. at ¶¶ 102-103. On March 24, 2017, she visibly almost fell multiple times while attempting to walk to the dining hall, causing corrections officers to obtain a wheelchair for her use that day. *Id*. at ¶¶ 104-105. Ms. Shaw has also been unable to attend yard, missed GED classes, religious services, and other institutional programs as the result of the DOC's denial of reasonable accommodations including access to a wheelchair. *Id*. at ¶ 106. On July 30, 2017, after a long walk to and from her housing unit and being forced to stand in medication line without use of a wheelchair, Ms. Shaw fell and broke her leg. *Id*. at ¶¶ 112-114. In light of this injury, the DOC temporarily granted her the use of a wheelchair. *Id*. at ¶115.[1]

### III.   STANDARD OF REVIEW

In evaluating Defendants' Rule 12(b)(6) motion the Court must accept all of Plaintiff's factual allegations as true and consider the complaint in the light most favorable to her. *Byers v. Intuit, Inc.*, 600 F.3d 286, 291 (3d Cir. 2010). In order for a complaint to survive a motion to dismiss, it must contain sufficient factual matter, accepted as true, to "state a claim to relief that

---

[1] However, since the filing of the First Amended Complaint, the DOC has taken away the wheelchair and her subsequent access to a walker. Moreover, during a recent visit to the Medical Department, Ms. Shaw was informed that her cane will also be taken away within the coming weeks.

is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A plaintiff's pleading burden is satisfied where the factual content of a complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Keybank Nat'l Assoc. v. Voyager Group, LP,* No. 09-1238, 2010 U.S. Dist. LEXIS 34071, *2 (W.D. Pa. Apr 7, 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). It is the defendant's burden to show that the Complaint fails to do this. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). Dismissal of claims under Rule 12(b)(6) should be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

IV. **ARGUMENT**

    A. <u>Plaintiff has Stated A Claim under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act</u>

Ms. Shaw has adequately stated a claim under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA").[2] Congress created the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). To state a claim under Title II, a plaintiff must establish that "(1) [she] is a qualified individual with a disability; (2) [she] was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of [her] disability." *Calloway v. Boro of Glassboro Dep't of Police*, 89 F. Supp. 2d 543, 551 (D.N.J. 2000); 42 U.S.C. § 12132. Title II of the ADA "has been interpreted as all-encompassing, and without any exception."

---

[2] The substantive standards for determining liability under the ADA and Rehabilitation Act are the same. *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995).

*Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232, 237 (M.D. Pa. 2003) (quotations omitted). ADA protections apply to the activities of correctional institutions. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998). As "a remedial statute, designed to eliminate discrimination against the disabled in all facets of society," the ADA "must be broadly construed to effectuate its purposes." *Schorr,* 243 F. Supp. 2d at 235 (citing *Tcherepnin v. Knight,* 289 U.S. 332, 335 (1967)).

The DOC does not dispute that Ms. Shaw is a qualified individual with a disability for purposes of the ADA & RA. *See generally* Brief in Support of Department of Corrections' Motion to Dismiss First Amended Complaint for Failure to State a Claim ("Def. Bf."), Dkt No. 19. Rather, with respect to the substance of Ms. Shaw's claims, the DOC essentially contends that Ms. Shaw requests too much by way of accommodation.[3] The DOC's argument misapprehends the essence and breadth of the ADA. Congress passed the ADA not to simply force public entities to give *some* accommodation to individuals with disabilities, but to ensure that public entities provide *reasonable* accommodation to ensure that individuals with disabilities receive *equal* access to and benefit of all programs and services the entity provides. As made clear by the allegations in the First Amended Complaint, the limited and inconsistent accommodations provided by the DOC fall far short of this standard.

The ADA "was cast in terms…of eliminating a form of discrimination that Congress considered unfair and even odious. The Act assimilates the disabled to groups that by reason of sex, age, race, religion, nationality, or ethnic origin are believed to be victims of discrimination." *Crawford v. Indiana Dep't of Corr.*, 115 F.3d 481, 486 (7th Cir. 1997). Importantly, the ADA's

---

[3] Notably, Defendant's argument relies in substantial part on the DOC's provision of a cane as an accommodation to Ms. Shaw. As noted *supra* note 1, since the filing of the First Amended Complaint, Ms. Shaw has been informed the DOC will soon be revoking her permission to use a cane.

text "demonstrates a recognition by Congress that discrimination against persons with disabilities differs from discrimination on the basis of, for example, gender, or race…[A] person with a disability may be the victim of discrimination precisely because [he] did not receive disparate treatment when [he] needed accommodation." *Presta v. Peninsula Corridor Joint Powers Bd*, 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998). The implementing regulations of the ADA "make clear" that discrimination "occurs when disabled persons, because of their disability, cannot derive a benefit from the state's services…even though [they] are given the exact same services or benefits as those afforded" to the non-disabled. *Belton v. Erickson*, Civ. Action No. 1:10-cv-0583, 2012 U.S. Dist. LEXIS 44681 at *26 (N.D. Ga. March 20, 2012) (citing 28 C.F.R. §35.130(b)(1)(ii)-(iii)). In other words, a public entity violates the ADA by failing to provide a reasonable accommodation that would allow disabled persons equal access or benefit. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) ("Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."). "In the context of disability, therefore, equal treatment may not beget equality, and facially neutral policies may be, in fact, discriminatory." *Presta*, 16 F. Supp. 2d at 1136.

Ms. Shaw was excluded from participating in programs and services at SCI Cambridge Springs due to her disability. The Supreme Court has observed that "modern prisons provide inmates with many recreational activities, medical services, and educational and vocational programs," all of which are covered by the ADA. *Yeskey,* 524 U.S. at 210 (quotations omitted). "[U]nder a common understanding of the terms, the prison and all of its facilities (i.e., the phone, the library, the yard, and meals) constitute services and programs…to which the ADA applies." *Owens v. Chester County,* Civ. A. No. 97-1344, 2000 U.S. Dist. LEXIS 710, at *32-33 (E.D. Pa.

6

Jan. 28, 2000). Ms. Shaw has been denied access to food at the dining hall, recreating in the yard, religious services, and GED classes as well as other programs at SCI Cambridge Springs. FAC at ¶¶ 98-100, 106. When she has tired to access these programs and services with appropriate accommodations, she has repeatedly fallen, resulting in serious injury on more than one occasion, including a broken leg. *Id*. at ¶¶ 97, 102, 104-105, 112-114.

Ms. Shaw has unquestionably adequately alleged that as a result of the DOC's failure to provide her with reasonable accommodations, she was unable to receive meaningful and equal access to and equal benefit from a multitude of programs and services. Consequently, Ms. Shaw has stated a claim under the ADA that the DOC failed to prove reasonable accommodations for her disability. *See CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 237 (3d Cir. 2013) (finding the ADA "requires that 'an otherwise qualified handicapped individual must be provided with meaningful access to the benefit' offered.") (quoting *Alexander* at 301); *Lonberg v. City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009)("[Title II's] prohibition against discrimination is universally understood as a requirement to provide 'meaningful access.'"); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003) (noting that a "reasonable accommodation" is one that gives an otherwise qualified plaintiff with a disability "meaningful access" to the program or service sought).

Ms. Shaw has also sufficiently plead a violation of the ADA with respect to her discriminatory firing from her prison job as a block worker. FAC at ¶¶ 68-80. Title II's prohibition of disability discrimination includes "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997). A public entity can violate the ADA even when they have not denied an individual access to a program or service. *Chisholm v. McManimon,*

275 F.3d 315, 330 (3d Cir. 2001) (finding that Title II "proscribes discrimination on the basis of disability without requiring exclusion per se.") (emphasis omitted); *see also Innovative Health Sys., Inc.*, 117 F.3d at 44-45 (finding that "the language of Title II's anti-discrimination provision does not limit the ADA's coverage to conduct that occurs in the 'programs, services, or activities'" of the public entity) (citation omitted). Ms. Shaw was removed from her job as a block worker solely on the basis of her disability, despite her continued ability to perform necessary tasks, the quintessential example of discrimination against individuals with disabilities. FAC at ¶¶ 69-72.[4]  Therefore, Ms. Shaw had adequately stated an ADA claim and Defendant's Motion to Dismiss should be denied.

    B.  Ms. Shaw's claims are Not Barred by Sovereign Immunity

Ms. Shaw's claims for damages under the ADA are not barred by sovereign immunity.[5] To determine whether Title II of the ADA validly abrogates sovereign immunity as to Ms.

---

[4] Defendant argues that Ms. Shaw's claim regarding her job removal would be moot if this Court finds sovereign immunity applies to her damages claim.  However, given the abrupt and unjustified nature of her previous termination, injunctive relief enjoining Defendant from again removing her from her job on the basis of her disability when she remains qualified to perform essential tasks, continues to be necessary. Thus, there is a live controversy surrounding her job removal claim, irregardless of this Court's finding on damages.

[5] There is no question that sovereign immunity does not bar Ms. Shaw's claim under Section 504 of the RA.  *See Koslow v. Pennsylvania*, 302 F.3d 161, 170 (3d Cir. 2002) ("The Supreme Court has recognized § 504 of the Rehabilitation Act, following the 1986 amendment, to be an 'unambiguous waiver of the State's Eleventh Amendment immunity.'") (*quoting Lane v. Pena*, 518 U.S. 187, 200, (1996).  "Accordingly, because Plaintiff's rights and remedies under both the ADA claims and the Rehabilitation Act claims are currently coextensive…the doctrine of constitutional avoidance militates reserving a decision on whether Congress has validly abrogated State Defendants' sovereign immunity to Plaintiff's ADA claims." *Smith v. Twp. of Warren*, No. 14-7178-BRM-LHG, 2016 U.S. Dist. LEXIS 177726, at *35-36 (D.N.J. Dec. 22, 2016); *see also Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 455 (5th Cir. 2005) ("[H]aving already held that sovereign immunity does not bar the appellants' claim under § 504, we need not address at this juncture the issue of abrogation under Title II of the ADA, because the rights and remedies under either are the same for purposes of this case.").

Shaw's claims, this court must "(1) identify which aspects of the State's alleged conduct violated Title II; (2) identify to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, determine whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Bowers v. NCAA*, 475 F.3d 524, 553 (3d Cir. 2007) (citing *United States v. Georgia*, 546 U.S. 151 (2006)).[6]

As discussed *supra*, Ms. Shaw has alleged a valid Title II claim. Defendant does not dispute that she is a qualified individual with a disability. She suffers from chronic neuropathic pain by serious medical conditions including spinal stenosis, osteoarthritis, and fibromyalgia which substantially limits her ability to walk and stand. *See e.g.,* FAC at ¶¶ 8-10. The DOC's refusal to provide consistent reasonable accommodations has deprived of access to meals, yard, religious services, and GED classes. *Id*. at ¶¶ 98-101, 106.

      i. The Underlying Conduct Also States a Violation of the Fourteenth Amendment

Under *Georgia*, this Court is "required next to determine whether the alleged misconduct" underlying Ms. Shaw's Title II claims "also violates the Fourteenth Amendment." *Bowers*, 475 F. 3d at 553. While Ms. Shaw did not bring a separate constitutional conditions of

---

[6] The Third Circuit has noted that "[a]pplying these factors requires 'a fact-intensive review that calls for individualized determinations.'" *Munchinski v. Solomon*, 618 F. App'x 150, 156 (3d Cir. 2015) (quoting *Bowers*, 475 F.3d at 546). This fact intensive review may be better undertaken at the summary judgment stage following complete discovery. Moreover, Eleventh Amendment immunity is an affirmative defense to which Defendant DOC bears the burden of proof. *See* Christy v. Pa. Tpk. Comm'n, 54 F.3d 1140, 1144 (3d Cir. 1995)("[T]he party asserting [it] bears the burden of proving entitlement to it."). Defendant has failed to carry this burden.

confinement claim, the facts underlying her ADA claim also support an Eighth Amendment claim. Ms. Shaw missed the majority of meals offered during the time she was denied use of a wheelchair and was constantly at risk of falling whenever she attempted to leave the housing unit. FAC at ¶¶ 98-102, 104-106, 112-114. The lack of accommodation lead to repeated falls and subsequent serious injury. *Id.* DOC staff evidenced deliberate indifference to this serious risk of harm and denial of the basic necessities of life by repeatedly ignoring her requests for an accommodation to assist her in accessing the dining hall and med line as well as other programs and services at SCI Cambridge Springs. *See e.g., id.* at ¶¶ 88-92, 97.

Multiple courts have found the "refusal of prison officials to accommodate [a prisoner's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs…independently violate[] the provisions of § 1 of the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. at 157; *see also Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 635 (8th Cir. 2014) (listing cases finding damages awards for inmates missing meals and being denied access to toilet facilities); *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 670 (7th Cir. 2012) ("Adequate food and facilities to wash and use the toilet are among the 'minimal civilized measure of life's necessities' that must be afforded prisoners.") (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Consequently, sovereign immunity is validly abrogated by Title II of the ADA for Ms. Shaw's claims alleging that DOC's refusal to provide her accommodations denied her access to hygiene, medical care and other prison programs. *See United States v. Georgia,* 546 U.S. at 157; *Dinkins*, 743 F.3d at 635 (remanding damages claims against state prison "because some of defendants' alleged behavior could violate the Eight and Fourteenth Amendments"); *Alster v. Goord*, 745 F. Supp. 2d 317, 338-39 (S.D.N.Y. 2010).

> ii. Title II's Abrogation of Sovereign Immunity was a Congruent and Proportional Response to the History of Discrimination Against Prisoners with Disabilities

If this Court finds Ms. Shaw's allegations "state[] a claim for violation of Title II but not the Fourteenth Amendment" the Court must then "determine whether Congress's purported abrogation of state sovereign immunity is nevertheless valid." *Bowers*, 475 F.3d at 554. This determination is made by evaluating the tripartite test set forth in *City of Boerne v. Flores*, 521 U.S. 507 (1997).

> Under the *Boerne* test, a court must (1) identify with some precision the scope of the constitutional right at issue; (2) examine whether Congress identified a history and pattern of unconstitutional discrimination by the states; and (3) determine whether the rights and remedies created by the ADA against the states are congruent and proportional to constitutional injury sought to be prevented.

*Mohney v. Pennsylvania*, 809 F. Supp. 2d 384, 394 (W.D. Pa. 2011) (*citing Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 368, 372-73 (2001) (quotations omitted).[7]

The constitutional right at issue in this case is the same as that presented in *Lane* and *Bowers*, "the right to be free from irrational discrimination on the basis of disability." *See Tennessee v. Lane*, 541 U.S. 509, 540 (2004) (explaining that "Title II purports to enforce a panoply of constitutional rights of disabled persons," including the equal protection right to be free from irrational discrimination); *Bowers*, 475 F.3d at 554 (concluding "[t]he right at issue in this case, as in *Lane*, is the right to be free from irrational disability discrimination").

---

[7] Defendant's reliance on *Baxter v. Pa. Dep't of Corr.* for the resolution of the *Boerne* factors is misplaced. *Baxter v. Pa. Dep't of Corr.*, No. 3:14-cv-126, 2016 U.S. Dist. LEXIS 29846 (W.D. Pa. Mar. 7, 2016). The dismissal in *Baxter* was affirmed on the basis of failure to state an ADA claim, without discussion of the lower court's analysis of sovereign immunity. *Baxter v. Pa. Dep't of Corr.*, 661 Fed. App'x 754, 756-57 (3d Cir. 2016). Moreover, *Baxter* relied heavily on *Cochran*, a decision which the Third Circuit vacated after the Supreme Court's holding in *Georgia* regarding Title II of the ADA and sovereign immunity. *Cochran v. Pinchak*, 401 F.3d 184, vacated, 412 F.3d 500 (3d Cir. 2005). Finally, the Court's analysis of the *Boerne* factors is significantly more narrow than the analysis undertaken by the Supreme Court, the Third Circuit and other district court cases in the Third Circuit. *See discussion infra.*

When addressing the second step of the *Boerne* analysis in *Bowers*, the Third Circuit succinctly stated only that "[t]he Court in *Lane* concluded that Congress had clearly identified a history and pattern of disability discrimination with respect to public services" before continuing to the third step. *Bowers,* 475 F.3d at 554.  Courts within the Third Circuit have repeatedly observed that "the second step of the analysis set forth in *City of Boerne* requires a consideration of Title II in a broader sense." *Zied-Campbell v. Richman*, 2007 U.S. Dist. LEXIS 23469, 2007 WL 1031399, at *9 (M.D. Pa. 2007); *see also Mohney*, 809 F. Supp. 2d at 396-97 (finding that *"*the Court's step-two inquiry is not limited to identifying a history and pattern of constitutional violations with respect to the particular conduct at issue in this case, i.e. police encounters with mentally disabled individuals.").  Moreover, this Court has previously held that it was bound by the Supreme Court's interpretation which "established that Congress' finding, together with the extensive record of disability discrimination that underlies it, makes clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." *Mohney*, 809 F. Supp. at 396-97 (quoting *Lane*, 541 U.S. at 529).   This Court should likewise find the second step of the *Boerne* analysis satisfied.

Accordingly, the only remaining question before this Court is "whether the remedies created by Title II are congruent and proportional to the pattern of unconstitutional disability discrimination identified by Congress." *Mohney*, 809 F. Supp. 2d at 397.  "The appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *City of Boerne*, 521 U.S. at 530 (citations omitted).  Unlike the previous steps in the *Boerne* analysis, the final step "requires the Court to consider the specific context of Plaintiff's claims and determine

whether Congress appropriately responded to the specific conduct at issue." *Mohney*, 809 F. Supp. 2d at 397 (citing *Lane*, 541 U.S. at 531).

Although this step asks for a more tailored analysis, it does not require an exact match between the particular facts at issue and the historical record of discrimination. Courts have repeatedly answered the question of congruity and proportionality at a higher level of generality than that proffered by the DOC. *See* Def. Bf. at 10. For example, in *Bowers*, the Third Circuit looked to the history of discrimination in the realm of access to public education generally, rather than seeking a specific finding of discrimination in participation in college athletics. *Bowers*, 475 F.3d at 555-56 (listing a variety of cases evidencing the history of discrimination in "access to public education" including accommodations for law school exams, class attendance and failure to provide sign language interpreters). Likewise, district courts within the Third Circuit have found the remedies of Title II congruent with the history of discrimination observed in the general settings of "encounters between law enforcement personnel and mentally disabled individuals" and parole decisions. *Mohney*, 809 F. Supp. 2d at 397; *White v. Del. Bd. of Parole*, No. 11-386-LPS, 2012 U.S. Dist. LEXIS 80451, at *9 (D. Del. June 8, 2012) ("The Court finds that Title II, as applied to cases implicating the right of a disabled inmate (i.e., one with a history of drug abuse) to a fair parole process is a valid exercise of Congress' authority to enforce the guarantees of the Fourteenth Amendment.").

The history of discrimination against prisoners with disabilities is long and pervasive. *See e.g., Lane*, 541 U.S. at 525 ("The decisions of other courts, too, document a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, public education, and voting.") (listing cases); *United States v. Georgia*, 546 U.S. at 161-62 (J. Stevens concurring) ("[T]he record of mistreatment of

prison inmates that Congress reviewed in its deliberations preceding the enactment of Title II was comparable in all relevant respects to the record that we recently held sufficient to uphold the application of that title to the entire class of cases implicating the fundamental right of access to the courts.") (listing cases and citing to congressional record).  In contrast to the extensive discrimination it sought to prevent, the remedies provided by Title II are carefully limited to achieve those ends.  As the Third Circuit noted in *Bowers*:

> Congress limited the scope of Title II in several respects. First, the statute only protects "qualified individuals with a disability." Second, Title II permits States to limit participation in their programs and activities for all other lawful reasons. Third, Title II only requires States to make "reasonable modifications to accommodate the disabled, thus protecting the States from having to compromise essential eligibility criteria for public programs. Finally, States are able to make available other accommodations if structural modifications of physical structures are too burdensome.

475 F.3d at 555-56 (quoting *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 488-89 (4th Cir. 2005)).  Given the decades of horrific conditions and discrimination experienced by prisoners with disabilities, "[t]he relief available under Title II of the ADA is congruent and proportional to the injury and the means adopted to remedy the injury." *Bowers*, 475 F.3d at 556; *see also Mohney*, 809 F. Supp. 2d at 397-98 ("Title II requires only reasonable modifications that would not fundamentally alter the nature of the service provided ….Providing police officers with proper training for handling mentally disabled persons would not impose an undue burden on the Commonwealth or PSP. It is, rather, a reasonable prophylactic measure, reasonably targeted to a legitimate end.") (quotations omitted) (quoting *Lane*, 541 U.S. at 533).  Therefore, Title II is a valid prophylactic measure for discrimination against prisoners with disabilities.  Thus, Ms. Shaw's claims under the ADA are not barred by sovereign immunity.

## V. CONCLUSION

For the foregoing reasons, Plaintiff Tracey Shaw respectfully requests that Defendant DOC's Motion to Dismiss be denied.

Respectfully submitted,

*/s/ Bret Grote*
Bret D. Grote, Esq.
PA ID No. 317273
**Abolitionist Law Center**
P.O. Box 8654
Pittsburgh, PA  15221
Tel:  (412) 654-9070
bretgrote@abolitionistlawcenter.org

*/s/ Alexandra Morgan-Kurtz*
Alexandra Morgan-Kurtz, Esq.
PA ID No. 312631
**Pennsylvania Institutional Law Project**
100 Fifth Ave, Ste 900
Pittsburgh, Pa 15222
Tel: (412) 434-6175
amorgan-kurtz@pailp.org

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLANIA

| | |
|---|---|
| TRACEY NADIRAH SHAW | : |
| *Plaintiff,* | : Civil No.  1:17-cv-00229-SPB |
| v. | : |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS; DR. REBECCA BURDETTE; and DR. LAWRENCE ALPERT, Medical Director at SCI Cambridge Springs | : ELECTRONICALLY FILED<br><br>: JURY TRIAL DEMANDED |
| *Defendants.* | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiff's Brief in Opposition to Defendant DOC's Motion to Dismiss filed by Alexandra Morgan-Kurtz was served upon the following via ECF on December 5, 2017:

Paula A. Koczan  
Michael C. Hamilton  
Weber Gallagher Simpson Stapleton  
Fires & Newby, LLP  
Four PPG Place  
5th Floor  
Pittsburgh, Pa 15222  

Scott A. Bradley  
Office of Attorney General  
564 Forbes Ave  
Manor Complex, 6th Floor  
Pittsburgh, Pa 15219  
sbradley@attorneygeneral.gov  

Respectfully submitted,  
/s/ Alexandra Morgan-Kurtz  
Attorney ID:  PA 312631  
Pennsylvania Institutional Law Project  
100 Fifth Ave, Ste 900  
Pittsburgh, PA 15222  
T:  (412) 434-6175