**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TRACEY NADIRAH SHAW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 17-229 Erie** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PENNSYLVANIA DEPARTMENT** | ) | |
| **OF CORRECTIONS, et al.,** | ) | **Magistrate Judge Richard A. Lanzillo** |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

Plaintiff Tracey Nadirah Shaw ("Plaintiff"), an inmate at the State Correctional Institution at Cambridge Springs ("SCI-Cambridge Springs"), initiated this civil rights action pursuant to 42 U.S.C. § 1983 for violations of her rights under the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act of 1973, 29 U. S. C. § 794. She also asserts a medical malpractice claim under Pennsylvania law. As Defendants, Plaintiff names the Pennsylvania Department of Corrections ("DOC") and two physicians at SCI-Cambridge Springs: Dr. Rebecca Burdette ("Dr. Burdette"), and Dr. Lawrence Alpert ("Dr. Alpert," and collectively with Burdette, the "Medical Defendants").

The DOC and the Medical Defendants have each filed a Motion to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF Nos. 13, 18. Plaintiff, through counsel, has responded to each motion. ECF Nos. 21, 22. For the reasons set forth

below, the DOC's motion will be granted in part and denied in part and the Medical Defendants' motion will be denied.[1]

## I.     Factual Background

In her First Amended Complaint, Plaintiff, a 48-year old woman incarcerated at SCI-Cambridge Springs, alleges that she suffers from several degenerative conditions that produce severe and chronic neuropathic pain in her back and legs.  Id. ¶¶ 4, 8.  Specifically, DOC medical personnel have diagnosed her with spinal stenosis, osteoarthritis of the spine, degenerative joint disease in her hips, fibromyalgia, and a herniated disc.  Id. ¶¶ 8, 11.  These conditions have caused her to experience extensive pain, numbness and tingling in her limbs, weakness in her legs, and difficulty walking.  Id. ¶¶ 9-11.

From 2007 to 2015, DOC medical staff treated Plaintiff's chronic neuropathic pain with an FDA-approved prescription drug called Lyrica.  Id. ¶¶ 12, 14, 21.  When administered at a dosage of 225 mg twice per day, Lyrica effectively managed Plaintiff's chronic pain and allowed her to perform the normal activities of her daily life.  Id. ¶¶ 16-17.  Lyrica also improved her flexibility and mobility and enabled Plaintiff to walk longer distances without collapsing or falling.  Id. ¶¶ 18-19.

On October 18, 2015, Dr. Burdette, a physician at SCI-Cambridge Springs, abruptly terminated Plaintiff's Lyrica prescription.  Id. ¶ 21.  Dr. Burdette did not visit with Plaintiff or conduct any physical examination prior to terminating her prescription.  Id.  A note in her medical file states only that the Lyrica prescription was "not medically necessary," despite that

---

[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636.  See ECF Nos. 9, 33.

Plaintiff's underlying conditions had not changed.  Id. ¶¶22-23.  Dr. Burdette also did not offer any alternative treatment for Plaintiff's chronic neuropathic pain.  Id. ¶ 24.

In the wake of Dr. Burdette's decision, Plaintiff repeatedly complained to Dr. Burdette and another physician at SCI-Cambridge Springs, Dr. Alpert, about her chronic pain and the corresponding disruption to her mood, ability to sleep, appetite, and mental health.  Id. ¶¶ 25-27.  Plaintiff explicitly requested reinstatement of her Lyrica prescription on at least seven occasions between December 9, 2015, and December 16, 2016.  Id. ¶ 28.  Despite her requests, Plaintiff alleges that she received no treatment of any sort for her chronic pain during the twelve-month period between September 2015 and September 2016.  Id. ¶ 34.

On August 26, 2016, a nurse examined Plaintiff and noted that her past prescriptions of Pamelor and Cymbalta had been ineffective in treating her pain.  Id. ¶ 29.  The same nurse made the following notations concerning Plaintiff's symptoms: "pain, burning/numbness in bilateral arms, bilateral legs, feet and fingers x 10 years.  Worsened in last 1 year . . . She reports daily pain . . . The pain waxes and wanes in severity . . . Lyrica was only drug that helped her."  Id. ¶ 30.  The nurse provided Plaintiff with an elevator pass so that she could avoid the stairs between prison floors and a "sit down" pass so that she could sit without losing her place in line while waiting for medications to be distributed.  Id. ¶¶ 31-33.

In September 2016, Dr. Alpert prescribed Plaintiff two other drugs - Relafen and Trileptal – in an attempt to alleviate her chronic pain.  Id. ¶ 35.  Neither medication was effective.  Id. ¶ 38.  Throughout 2016 and 2017, Plaintiff continued to unsuccessfully petition Dr. Alpert and administrative staff at SCI-Cambridge Springs to provide her with Lyrica.  Id. ¶¶ 43-44.  Plaintiff's legal counsel also contacted the prison on her behalf and requested that her

prescription be reinstated.  Id. ¶ 45.  Despite these pleas, Dr. Alpert refused to renew her prescription for Lyrica.  Id. ¶ 42.

On December 23, 2016, the prison removed Plaintiff from her job as a block worker "because her medical conditions were suddenly too serious to permit her to perform basic janitorial tasks . . .".  Id. ¶ 69.  Although the prison cited her "medical restrictions" as the basis for her termination, Plaintiff had performed the same job for several years without complaint or objection while subject to the precise same restrictions.  Id. ¶72.  The prison ultimately reinstated her job in May 2017.  Id. ¶ 78.

Around that same time, Plaintiff was examined by a new physician, Dr. Alley, who reinstated her prescription for Lyrica at a significantly lower dose than she had previously received.  Id. ¶ 51.  The decreased dosage – 75 mg twice per day – was insufficient to alleviate Plaintiff's chronic pain.  Id. ¶ 54.

On July 24, 2017, Dr. Alpert informed Plaintiff that he did not want her to have Lyrica and that he would neither increase her dosage nor extend her prescription.  Id. ¶¶ 57, 62.  Dr. Alpert compared long-term use of Lyrica to taking heroin or opium and explained that Plaintiff could not be on it because she was serving a lengthy prison sentence.  Id. ¶ 59.  Instead, Dr. Alpert prescribed Relafen and a muscle relaxer, neither of which was effective.  Id. ¶ 61.

Aside from medication, the prison occasionally offered Plaintiff alternative accommodations, such as a cane or a wheelchair, to assist with her mobility.  In October 2016, Dr. Alpert prescribed Plaintiff with a wheelchair for assistance on long walks.  However, her wheelchair was taken away in December 2016 "due to a determination that her condition did not require it to assist in traveling distances."  Id. ¶ 70.  As a result, Plaintiff fell and injured herself on several occasions while attempting to walk long distances.  Id. ¶¶ 102, 112.  One particular

4

fall, sustained on July 30, 2017, resulted in a broken leg, surgery, and the insertion of six screws. Id. ¶¶ 113-14.

As a result of Plaintiff's mobility issues, she has been deprived of "an extraordinary amount of meals" in the absence of a wheelchair or similar accommodation. Id. ¶ 79. Plaintiff routinely misses at least two of the three daily meals provided by the prison due to the pain of walking to the dining hall and the possibility that she might fall down without a wheelchair. Id. ¶¶ 98-99. Plaintiff has missed all three of the meals provided by the prison on several occasions. Id. ¶ 100. As a result, Plaintiff has lost more than 20 pounds since her wheelchair was taken away. Id. ¶ 101. She has also missed GED classes, religious services, and other programs offered by the prison that she would otherwise be able to attend. Id. ¶ 106.

## II.    Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)). See also Ashcroft v. Iqbal, 556 U.S. 662 (2009)). A complaint should only be dismissed pursuant to Rule 12 (b)(6) if it fails to allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570 (rejecting the traditional 12 (b)(6) standard established in Conley v. Gibson, 355 U.S. 41 (1957)). In making this determination, the court must accept as true all well-pled factual allegations in the complaint and views them in a light

most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002).

While a complaint does not need detailed factual allegations to survive a motion to dismiss, a complaint must provide more than labels and conclusions. Twombly, 550 U.S. at 555. A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). Moreover, a court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employee Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions disguised as factual allegations. Twombly, 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). See also McTernan v. City of York, Pennsylvania, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Expounded on the Twombly/Iqbal line of cases, the Third Circuit has articulated the following three-step approach:

> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (quoting Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010)). This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

**III.    Analysis**

6

**A. ADA and Rehabilitation Act Claims (Counts I and IV)**

The heart of this action is Plaintiff's contention that the DOC violated Title II of the ADA (Count I) and § 504 of the Rehabilitation Act (Count IV) by removing her from her prison job and failing to provide her with reasonable accommodations for her disability. "Because the same standards govern both the [Rehabilitation Act] and ADA claims," both claims may be addressed "in the same breath." Chambers *ex rel*. Chambers v. School Dist. of Phila. Board of Educ., 587 F.3d 176, 189 (3d Cir. 2009) (citing McDonald v. Pennsylvania, 62 F.3d 92, 95 (3d Cir.1995) ("Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same." (citation omitted)). To establish a violation of either statute, a plaintiff must demonstrate: (1) that she is a qualified individual; (2) with a disability; and (3) that she was denied the opportunity to participate in or benefit from the services, programs, or activities of a public entity, or was otherwise subject to discrimination by that entity, by reason of her disability. Bowers v. National Collegiate Athletic Association, 475 F.3d 524, 553 c. 32 (3d Cir. 2007). Each of her two discrete claims will be addressed in turn.

**1. Removal of Prison Job**

Plaintiff first contends that the DOC "discriminated against [her] by removing her from her job on the basis of her disability without offering a replacement." ECF No. 12 ¶ 118. More specifically, she states that "a decision was made to strip [her] of her job purportedly because her medical conditions were suddenly too serious to permit her to perform basic janitorial tasks as a block worker" despite that her medical restrictions had not changed from those which she "had for years while successfully working the job." Id. ¶¶ 69, 72. Defendants do not suggest that these allegations are factually insufficient to state a claim for relief; rather, they contend that

Plaintiff's ADA claim is barred by the immunity afforded to the Commonwealth of Pennsylvania by the Eleventh Amendment.[2]

"That a State may not be sued without its consent is a fundamental rule of jurisprudence." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984).  The sovereign immunity afforded by the Eleventh Amendment provides states and state agencies – including the DOC and its officials – with immunity from suit in federal court unless, *inter alia*, said immunity has been abrogated by Congress or waived by the state.[3]  MCI Telecomm Corp. v. Bell-Atlantic-Pennsylvania, 271 F.3d 491, 503 (3d Cir. 2001).  See also Pennhurst, 465 U.S. at 98; Lavia v. Pennsylvania, Dept. of Corrections, 224 F.3d 190, 195 (3d Cir. 2000) (noting that, as an agency of the Commonwealth of Pennsylvania, the DOC is entitled to assert the immunities afforded by the Eleventh Amendment).  At issue here is the extent to which Congress abrogated state sovereign immunity by enacting the ADA.  In the absence of Congressional abrogation, Plaintiff's ADA claim is barred by the Eleventh Amendment and must be dismissed.[4]

---

[2] Defendants do not argue that Plaintiff's Rehabilitation Act claim based on the same conduct should be dismissed, presumably because it is well-settled that sovereign immunity does not bar claims under Section 504 of the Rehabilitation Act.  See Koslow v. Pennsylvania, 302 F.3d 161, 170 (3d Cir. 2002) ("[T]he Supreme Court has recognized § 504 of the Rehabilitation Act, following the 1986 amendment, to be an 'unambiguous waiver of the State's Eleventh Amendment immunity.'") (quoting Lane v. Pena, 518 U.S. 187, 200 (1996)).

[3] A third exception to sovereign immunity permits a plaintiff to sue individual state officers for prospective relief to end an ongoing violation of federal law.  Even if Plaintiff were seeking prospective relief with respect to the removal of her prison job, which she is not, see ECF No. 12 at p. 17 (requesting injunctive relief only as to her prescription for Lyrica and the reinstatement of her wheelchair), the fact that her position has been restored would render such a claim moot.  See, e.g., McGrath v. Johnson, 67 F.Supp.2d 499, 507 (E.D. Pa. 1999) (dismissing inmate's request for prospective relief as moot where the prospective relief that he sought – restoration of his job at the prison law library - had already been provided).

[4] Citing the doctrine of constitutional avoidance, Plaintiff suggests that the similar nature of the rights and remedies afforded by the Rehabilitation Act and the ADA eliminates the need to determine whether her Title II claim is barred by sovereign immunity, at least at this juncture.  See Bennett-Nelson v. Louisiana Bd. of Regents, 431 F.3d 448, 455 (5th Cir. 2005) ("[H]aving already held that sovereign immunity does not bar the appellants' claim under § 504, we need not address at this juncture the issue of abrogation under Title II of the ADA, because the rights and remedies under either are the same for purposes of this case.").  The Third Circuit, however, has seemingly foreclosed this approach.  Bowers, 475 F.3d at 550 ("While we do not disagree that the protections afforded by Title II and Section 504 are substantially similar, we do not believe that prudence in the form of constitutional avoidance warrants abrogating [plaintiff's] right to bring a claim under Title II.") (internal citation omitted).

In United States v. Georgia, the United States Supreme Court held that Title II of the ADA abrogates sovereign immunity only as to state conduct that actually violates the Constitution. 546 U.S. 151, 159 (2006). To apply this principle to a particular claim, the Third Circuit has endorsed the following three-step analysis: "1) identify which aspects of the State's alleged conduct violated Title II; (2) identify to what extent such conduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, determine whether Congress' purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." Bowers, 475 F.3d at 553. For claims that fall into the latter category, the court must make an additional determination: whether there is "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Tennessee v. Lane, 541 U.S. 509, 520 (2004). This determination requires the court to perform yet another tripartite analysis, this one drawn from the United States Supreme Court's decision in City of Boerne v. Flores, 521 U.S. 507, 529 (1997). Under the Boerne "congruence and proportionality" test, the court must: (1) identify "with some precision the scope of the constitutional right at issue;" (2) examine whether Congress has identified a history and pattern of unconstitutional discrimination by the states; and (3) determine whether the rights and remedies created by the ADA against the states are congruent and proportional to the constitutional injury sought to be prevented. Board of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. 356, 363 (2001).

Turning to the first element of the Bowers test, there is no question that Plaintiff's allegation that she was removed from her prison job because of her disability is sufficient, at this stage in the proceedings, to state a claim for relief under Title II of the ADA. However, courts have widely held that there is no constitutional right to participate in prison educational and

vocational programs.  Fountain v. Vaughn, 679 Fed. Appx. 117, 120 n. 2 (prisoner's loss of

employment privileges did not support an Eighth Amendment claim); Baxter v. Penn. Dept. of

Corr., 2016 WL 1165977, at *3 (W.D. Pa. Mar. 7, 2016) (plaintiff's removal from a prison

vocational program did not implicate a constitutional right).  Nor are the disabled (or, for that

matter, inmates at large) a suspect class for purposes of an Equal Protection challenge.  Bowers,

475 F.3d at 553.  Consequently, the conduct alleged by Plaintiff violates Title II of the ADA but

not the Fourteenth Amendment.  Under such circumstances, the Court must turn to the three-step

Boerne test to determine whether "Congress' purported abrogation of state sovereign immunity

is nevertheless valid."  Bowers, 475 F.3d at 554.

The first step of the Boerne analysis requires the Court to identify the scope of the

constitutional right at issue with "some precision."  Garrett, 531 U.S. at 363.  In broad brush, the

constitutional right at issue in this case is "the right to be free from irrational discrimination on

the basis of disability."  Bowers, 475 F.3d at 554 (citing Lane, 541 U.S. at 540 (explaining that

"Title II purports to enforce a panoply of constitutional rights of disabled persons, including the

equal protection right to be free from irrational discrimination)).  More narrowly, the right at

issue is that of a disabled inmate to obtain and keep prison employment.  Baxter, 2016 WL

1165977, at *3.

Moving to the second step, the Court must determine whether Congress has identified a

history and pattern of unconstitutional discrimination by the states with respect to the right at

issue.  In Lane, the Supreme Court "considered evidence of disability discrimination in the

administration of public services and programs generally . . . and concluded that Title II in its

entirely satisfies Boerne's step-two requirement that it be enacted in response to a history and

pattern of States' constitutional violations."  Cochran v. Pinchak, 401 F.3d 184, 191 (3d Cir.

2005) (citing <u>Lane</u>, 541 U.S. at 554 n. 35).[5]  Several Courts of Appeals, including the Third

Circuit, have concluded that "the second prong of the <u>Boerne</u> test [has been] conclusively

established with respect to Title II" by virtue of the Supreme Court's decision.  <u>Mohney v.

Pennsylvania</u>, 809 F.Supp.2d 384, 297 (W.D. Pa. 2011) (citing <u>Cochran</u>, 401 F.3d at 191).

The final <u>Boerne</u> element requires the Court to determine "whether the remedies created

by Title II are congruent and proportional to the pattern of unconstitutional disability

discrimination identified by Congress."  <u>Mohney</u>, 809 F.Supp.2d at 397.  "[U]nlike the second

step of the <u>Boerne</u> analysis, step three requires the Court to consider the specific context of

Plaintiff's claims and determine whether Congress appropriately responded to the *specific

conduct* at issue."  <u>Id</u>. (emphasis added).  <u>See</u> <u>also</u> <u>Lane</u>, 541 U.S. at 531 (explaining that, with

respect to the third step of the <u>Boerne</u> analysis, "nothing in our case law requires us to consider

Title II, with its wide variety of applications, as an undifferentiated whole").  In this regard, a

comparison between two prior decisions from this judicial district – <u>Mohney</u> and <u>Baxter</u> – is

instructive.  In <u>Mohney</u>, the issue before the court was "discrimination in the context of

encounters between law enforcement personnel and mentally disabled individuals."  <u>Id</u>. at 397.

Reviewing the legislative history of the ADA, the court observed that Congress had identified

"[i]mproper handling and communication with handicapped persons by law enforcement

personnel" as an "area in which problems of discrimination occur."  <u>Id</u>. at 397-98 (quoting U.S.

Commission on Civil Rights, Accommodating the Spectrum of Individual Abilities 165 (1983)).

The court concluded that the concerns identified by Congress could be alleviated through

---

[5] Although the Third Circuit's decision in <u>Cochran</u> was vacated pending the Supreme Court's decision in <u>Georgia</u>, 546 U.S. 151, the Court's conclusion that Title II satisfies the second step of the <u>Beorne</u> test was not disturbed.  <u>See</u> <u>Mohney v. Pennsylvania</u>, 809 F.Supp.2d 384, 397 n. 9 (W.D. Pa. 2011).  <u>See</u> <u>also</u> <u>Lopez v. Beard</u>, 2008 WL 3887627, at *4 (W.D. Pa. Aug. 1, 2008) ("<u>Cochran</u> was withdrawn in the expectation that <u>United States v. Georgia</u> might alter the legal framework for analyzing ADA claims against states, but <u>Cochran's</u> analysis is unaffected by <u>United States v. Georgia</u>.").

"congruent and proportional" responses that would not impose an undue burden on the state, such as "[p]roviding police officers with proper training for handling mentally disabled persons." Id. at 398.

In Baxter, the plaintiff-inmate alleged that he had been removed from an auto mechanics vocational course based on his disability (a back injury that required him to use a cane) in violation of Title II. 2016 WL 1165977, at *1. Unlike in Mohney, the Baxter court found "nothing in the legislative history" of the ADA "that suggests remedying disability discrimination in vocational programs for prison inmates (as opposed to persons placed in large-scale residential institutions as a result of handicaps due to mental retardation or mental illness) was contemplated by Congress" or that "Congress was responding to a history of such discrimination against inmates." Id. at *3. Consequently, the court rejected the plaintiff's Title II claim at the final stage of the Boerne analysis, stating:

> [T]he Cochran panel found that since Title II of the ADA conflicted with the general ability of States to operate prisons so long as they complied with the Equal Protection Clause, to permit money damages against states for violations of Title II that were "rooted in" the Equal Protection Clause but not actual violations of the Equal Protection Clause would in effect re-write Fourteenth Amendment law. Cochran v. Pinchak, supra, 401 F.3d at 191, 193. That conclusion cannot be disputed. [Plaintiff] has no claim for money damages under the ADA.

Id. at *4.

The Court finds Baxter persuasive. In addition to the dearth of legislative history concerning prison vocational programs and employment, the Supreme Court and lower courts have repeatedly cautioned against judicial interference in the day-to-day management of prisons. Wolff v. McDonnell, 418 U.S. 539, 566 (1974) (noting that prison officials require broad discretionary authority as the "operation of a correctional institution is at best an extraordinarily difficult undertaking"); Bell v. Wolfish, 441 U.S. 520, 527 (1979) (prison administrators should

be accorded wide-ranging deference in the adoption and execution of policies and practices that are needed to preserve internal order and to maintain institutional security); Brooks v. Samuel, 2018 WL 2287510, at *2 (M.D. Pa. May 18, 2018) ("The federal courts are not overseers of the day-to-day management of prisons."). As noted in Cochran, the ADA "affects far more state prison conduct and prison services, programs, and activities than the Equal Protection Clause protects." Id. at 192-93. Permitting a plaintiff to seek monetary damages under the ADA for conduct that does not violate the Constitution would impede prison officials' "ability to make an individual assessment of what is rational and safe in the prison context" and "prevent an official from making classifications amongst prisoners that are rationally related" to safety concerns and other legitimate government interests. Id. In other words, in the prison context, the remedies created by Title II are not "congruent and proportional" to the pattern of disability discrimination identified by Congress. Baxter, 2016 WL 1165977, at *4. See also Meeks v. Schofield, 10 F.Supp.3d 774, 797 (M.D. Tenn. 2014) (finding no abrogation of sovereign immunity for conduct that violates Title II but not the Fourteenth Amendment because "prison administrators should be afforded deference in the execution of practices that, in their judgment, are needed to preserve internal order and discipline and to maintain institutional security" so long as those practices do not violate the Constitution). Accordingly, Plaintiff's Title II claim for monetary damages based on the termination of her prison employment must be dismissed.

### 2. Reasonable Accommodation

Plaintiff's next allegation – that the prison violated Title II by refusing to provide her with a necessary accommodation for her mobility impairments – is subject to the same analysis. As with her employment claim, the Court must first identify "which aspects of the State's alleged conduct violated Title II." Bowers, 475 F.3d at 553. The critical question with respect to this

claim is whether the prison provided Plaintiff with a reasonable accommodation for her disability. The DOC suggests that, "[w]hile Plaintiff did not always receive a wheelchair, she was always provided with a reasonable accommodation under the circumstances." ECF No. 19 at 11. For example, Plaintiff concedes that she has occasionally been provided with a cane, an elevator pass, or a sit-down pass. In the DOC's view, Plaintiff is complaining that she has been denied her *preferred* accommodation, rather than a *reasonable* accommodation. See <u>Baxter</u>, 2016 WL 1165977, at *5 (noting that the ADA requires "reasonable accommodation, not the plaintiff's requested accommodation").

Plaintiff responds that each of the DOC's alternative accommodations has failed to resolve her mobility issues. When denied a wheelchair, Plaintiff has missed the vast majority of her meals and has been denied the ability to participate in prison programs and services offered to able-bodied inmates. Moreover, when she has attempted to access those programs and services without a wheelchair, she has repeatedly fallen, resulting in serious injuries on several occasions (including a broken leg). In short, Plaintiff contends that she has been offered some accommodation, but not a reasonable accommodation.

Accepting Plaintiff's factual allegations as true, and drawing all inferences in her favor, the Court finds that Plaintiff has sufficiently alleged a Title II violation. A fair reading of the Amended Complaint suggests that the alternative accommodations offered by the prison were insufficient to allow Plaintiff to meaningfully access vital services, including meals. See <u>Defreitas v. Montgomery County Correctional Facility</u>, 525 Fed. Appx. 170, 178 n. 14 (3d Cir. 2013) ("Reasonable accommodations must give a disabled prisoner 'meaningful access' to the prison program in question.") (quoting <u>Alexander v. Choate</u>, 469 U.S. 287, 301 (1985)). A disabled individual's inability to participate in services and programs that she could have

received had she been offered a reasonable accommodation is the *sine qua non* of a Title II violation. See, e.g., Matthews v. Penn. Dept. of Corrections, 613 Fed. Appx. 163, 168-69 (3d Cir. 2015) (inmate's allegation that his ankle injury required reasonable accommodations such as a wheelchair or a lower-tier cell was sufficient to state a Title II claim); Wareham v. Penn. Dept. of Corrections, 2014 WL 3529996, at *11-12 (W.D. Pa. July 15, 2014) (inmate's allegation that he missed "some meals and some yard-outs that he would have went to" had he been offered reasonable accommodations for his mobility impairments was sufficient to state an ADA violation). Moreover, to the extent that the parties disagree as to the reasonableness of the accommodations offered by the DOC, such determinations are best made on a fully developed record. See, e.g., Chisolm v. McManimon, 275 F.3d 315, 327 (3d Cir. 2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact . . ."); Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir. 1995) (under the ADA, "a determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry").

Having determined that the conduct at issue violates Title II of the ADA, the second step of the Bowers analysis requires a determination as to whether the same alleged conduct also implicates the Fourteenth Amendment. Bowers, 475 F.3d at 553. The Court concludes that it does. The United States Supreme Court has held that the "refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs . . . independently violate[s] the provisions of § 1 of the Fourteenth Amendment." United States v. Georgia, 546 U.S. at 157. Other courts, including the Third Circuit, have reached the same conclusion. See Farmer v. Brennan, 511 U.S. 825, 832 (1994) (noting that prison officials must provide inmates with adequate food, clothing, shelter and medical care); Lindsey v. O'Connor, 327 Fed. Appx. 319, 321 (3d Cir. 2009) (denial

of food to inmates violates the Constitution where the deprivation is substantial); Dinkins v. Correctional Medical Services, 743 F.3d 633, 634-35 (8th Cir. 2014) (alleged "denials of meals and adequate housing by reason of [a] disability" can form the basis for a viable ADA claim); Jaros v. Ill. Dept. of Corrections, 684 F.3d 667, 672 (7th Cir. 2012) ("Adequate food and facilities to wash and use the toilet are among the minimal civilized measure of life's necessities that must be afforded prisoners") (internal quotations omitted). Based on Plaintiff's allegation that she has been denied the ability to participate in meals and other vital services, the DOC's refusal to provide her with reasonable accommodations, if substantiated through discovery, might rise to the level of a Constitutional injury for purposes of the Bowers abrogation analysis. Accordingly, the Court will permit Plaintiff's Title II claim based on an alleged failure-to-accommodate to proceed to discovery.

## B. Eighth Amendment – Deliberate Indifference (Count II)

In Count II of her Amended Complaint, Plaintiff contends that the Medical Defendants violated the Eighth Amendment's prohibition against cruel and unusual punishment by displaying deliberate indifference to her serious medical needs. See Estelle v. Gamble, 429 U.S. 97 (1976) (stating that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment") (internal quotation omitted). To establish a violation of his constitutional right to adequate medical care, a plaintiff is required to allege facts that demonstrate: (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury,

Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

Plaintiff's claims in the instant action focus on the Medical Defendants' decision to terminate her prescription for Lyrica and refusal to reinstate that prescription despite her chronic neuropathic pain. Ordinarily, "an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim." Tillery v. Noel, 2018 WL 3521212, at *5 (M.D. Pa. June 28, 2018) (collecting cases). Such complaints fail as constitutional claims because "the exercise by a doctor of his professional judgment is never deliberate indifference." Gindraw v. Dendler, 967 F. Supp. 833, 836 (E.D. Pa. 1997) (citing Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.")). "Therefore, where a dispute in essence entails nothing more than a disagreement between an inmate and doctors over alternate treatment plans, the inmate's complaint will fail as a constitutional claim under § 1983." Tillery, 2018 WL 3521212, at *5 (citing Gause v. Diguglielmo, 339 Fed. Appx. 132 (3d Cir. 2009) (characterizing a dispute over pain medication as the type of "disagreement over the exact contours of [plaintiff's] medical treatment" that does not violate the constitution)).

On the other hand, "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." Palakovic v. Wetzel, 854 F.3d 209, 228 (3d Cir. 2017). For instance, "prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier and less efficacious treatment' of the inmate's condition." Id. (quoting West v. Keve, 571 F.2d 158, 162 (3d Cir. 1978)). Nor may "prison

authorities deny reasonable requests for medical treatment . . . [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" Id. (quoting Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.3d 326, 346 (3d Cir. 1987)). Finally, prison officials may not intentionally refuse to provide any medical treatment despite their awareness that some form of medical intervention is required. Monmouth County, 834 F.2d at 346. See also Atkinson v. Taylor, 316 F.3d 257, 266 (3d Cir. 2003) ("Needless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, . . . violates the Eighth Amendment.").

In the instant case, Plaintiff asserts that Dr. Burdette and Dr. Alpert failed to provide her with necessary and helpful medication (or, for the majority of the time at issue, any treatment at all) despite their awareness of her severe medical impairments. While an inmate's "disagreement [with prison officials] as to the proper medical treatment" will not ordinarily support an Eighth Amendment claim, "there is a critical distinction 'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'" Pearson v. Prison Health Service, 850 F.3d 526, 535 (3d Cir. 2017) (quoting United States ex rel. Walker v. Fayette Cty., 599 F.2d 573, 575 n. 2 (3d Cir. 1979)). Here, Plaintiff avers that Dr. Burdette and Dr. Alpert deprived her of *any* treatment for her conditions during 16 of the 22 months after Dr. Burdette took her off of Lyrica. She also alleges that neither doctor examined her before terminating her prescription or consulted with her to evaluate the efficacy of the other treatments that they occasionally offered. While recognizing the "high bar the [plaintiff] must meet in order to ultimately prevail" on her medical indifference claim, Plaintiff's allegations of a complete deprivation of meaningful care for her serious medical needs are sufficient, at this nascent stage of the proceedings, to state a claim for relief. See, e.g.,

Palakovic, 854 F.3d at 228 (holding that plaintiff stated a claim for medical indifference where medical staff failed to "provide [plaintiff] with necessary forms of treatment" or to "evaluate the efficacy" of the alternative treatments offered); O'Donnell v. Rowe, 2018 WL 4572721, at *6 (M.D. Pa. Aug. 6, 2018) (denying motion to dismiss based on allegation that prison physician terminated an effective prescription that plaintiff had been receiving for over ten years without providing any alternative treatment). Accordingly, Defendants' motion to dismiss this claim will be denied.

### C. Medical Malpractice (Count III)

The third count of Plaintiff's Amended Complaint asserts a claim of medical malpractice against Dr. Burdette and Dr. Alpert. Defendants contend that this claim should be dismissed because of Plaintiff's failure to file a certificate of merit within 60 days of the filing of her initial complaint.

Rule 1042.3 of the Pennsylvania Rules of Civil Procedure requires a plaintiff in a medical malpractice action to file a certificate of merit with the complaint, or within 60 days after the filing thereof, attesting that there is a reasonable probability that the medical care described in the complaint fell outside of acceptable professional standards. The Third Circuit has held that Rule 1042.3 is substantive law that must be applied by federal courts under Erie R.R. v. Thompkins, 304 U.S. 64 (1983). See Liggon-Redding v. Estate of Sugarman, 659 F.3d 258, 262-64 (3d Cir. 2011). Thus, for purposes of a motion to dismiss, the Pennsylvania certificate of merit rule is applied as "controlling, substantive state law." Scaramuzza v. Sciolla, 345 F.Supp.2d 508, 509-10 (E.D. Pa. 2004).

"[A] plaintiff's failure to comply with Rule 1042.3 requires dismissal of any malpractice claim." Bennett v. PrimeCare Medical, Inc., 2018 WL 6072126, at *10 (M.D. Pa. Sept. 14,

2018).  However, "Pennsylvania practice expressly provides plaintiffs with notice of Rule 1042.3's requirements and an opportunity to cure any failure to file a certificate of merit before a matter is dismissed."  TranSystems Corp. v. Hughes Associates, Inc., 2014 WL 6674421, at *5 (M.D. Pa. Nov. 24, 2014).  Under Pennsylvania Rule 1042.6:

> (a) ... a defendant seeking to enter a judgment of non pros under Rule 1042.7(a) shall file a written notice of intention to file the praecipe and serve it on the party's attorney of record or on the party if unrepresented, no sooner than the thirty-first day after the filing of the complaint.

Pa. R. Civ. P. 1042.6(a).  No judgment can be entered against a plaintiff for failure to timely file a certificate of merit until the defendant has complied with the notice requirements of Rule 1042.6(a).  Pa. R. Civ. P. 1042.7(a)(4); Schmigel v. Uchal, 800 F.3d 113, 124 (3d Cir. 2015) ("The condition of thirty days' notice prior to seeking dismissal of an action for failure to comply with the [certificate of merit] regime is substantive and must be applied in federal court.").

Plaintiff commenced this action on August 21, 2017.  Defendants sought dismissal on November 3, 2017, providing notice, for the first time, of Plaintiff's failure to attach a certificate of merit.  Plaintiff corrected that deficiency within five days of receiving notice (and within 79 days of filing the complaint).  As noted by the Third Circuit, "federal courts have frequently declined to dismiss cases pursuant to Rule 1042.3 where the plaintiff has timely cured the failure to file a certificate of merit by filing a certificate of merit after receiving notice of this deficiency from the defendant."  Schmigel, 800 F.3d at 123 n. 15 (quoting TranSystems Corp., 2014 WL 6674421, at *5).  See also, e.g., Berger v. Hanemann Univ. Hosp., 2017 WL 5570340, at *3 n. 3 (E.D. Pa. Nov. 17, 2017) (noting that the Pennsylvania Rules allow a plaintiff to file a certificate of merit before the latter of *either* the 60-day period commencing with the filing of the complaint or the 30-day period following notice); Thompson v. Hens-Greco, 2017 WL 3616672, at *4 n. 7 (W.D. Pa. April 11, 2017) ("A defendant must wait 30 days after giving notice of the [lack of a

certificate of merit] to allow for cure"); <u>Moyer v. Berks Heim Nursing Home</u>, 2014 WL

1096043, at *6 (E.D. Pa. Mar. 20, 2014) (denying motion to dismiss because "Plaintiffs filed a

certificate of merit within 30 days of defendants' motion to dismiss"); <u>Fabian v. United States</u>,

2013 WL 5525647, at *2 n. 2 (E.D. Pa. Oct. 7, 2013) (noting that Rule 1042.6 affords the

plaintiff an opportunity to cure the omission of a certificate of merit before dismissal); <u>Robles v.</u>

<u>Casey</u>, 2012 WL 382986, at *3 (M.D. Pa. Feb. 6, 2012) (declining to dismiss case when plaintiff

filed certificate of merit eight days after defendant sought dismissal).  Because Plaintiff timely

cured her failure to file a certificate merit after receiving notice of that deficiency, the Medical

Defendants' motion to dismiss must be denied.

## V.      CONCLUSION

For all of the foregoing reasons, the DOC's Motion to Dismiss (ECF No. 18) is GRANTED

in part and DENIED in part.  Specifically, the DOC's motion is granted with respect to Plaintiff's

ADA claim based on the removal of her prison employment and denied in all other aspects.[6]  The

Medical Defendants' motion (ECF No. 13) is DENIED.   An appropriate case management order

will follow.

/s/ Richard A. Lanzillo_____
RICHARD A. LANZILLO
United States Magistrate Judge

Dated: December 28, 2018

---

[6] The DOC's original Motion to Dismiss (ECF No. 10), filed prior to Plaintiff's submission of her Amended
Complaint, is dismissed as moot in light of the Amended Complaint.